GEOFFREY A. NERI (SBN 258802)
 (geoff@bnsklaw.com)
TIMOTHY G. LAMOUREUX (SBN 294048)
 (tim@bnsklaw.com)
**BROWN NERI, SMITH & KHAN LLP**
11601 Wilshire Blvd., Ste. 2080
Los Angeles, CA 90025
T: (310) 593-9890
F: (310) 593-9980

Attorneys for Plaintiff,
KEVIN HICKS

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA –SAN JOSE DIVISION

| | |
|---|---|
| KEVIN HICKS, an individual, | Case No.: |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | (1) BREACH OF CONTRACT |
| ROBERT LOUIS STEVENSON SCHOOL, a California corporation; BOARD OF TRUSTEES OF THE ROBERT LOUIS STEVENSON SCHOOL, an unincorporated association of individuals; and DOES 1-20, inclusive, | (2) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING |
| Defendants. | (3) FRAUD – INTENTIONAL MISREPRESENTATION |
| | (4) BREACH OF FIDUCIARY DUTY |
| | (5) FAILURE TO PAY WAGES UPON TERMINATION – CAL. LABOR CODE §§ 201, 202, 203 |
| | (6) CONTRACTUAL AND STATUTORY INDEMNITY PURSUANT TO CALIFORNIA LABOR CODE 2802 |
| | **<u>DEMAND FOR JURY TRIAL</u>** |

**INTRODUCTION**

1.    This case arises from the wrongful discharge of Dr. Kevin Hicks ("Dr. Hicks") as President of the Stevenson School ("Stevenson"), an independent PK-12 boarding and day school on the Monterey Peninsula.  Dr. Hicks, who is a Stevenson graduate, was more than just an employee or officer of Stevenson.  Indeed, Hicks's employment agreement with Stevenson and the bylaws of Stevenson's Board of Trustees (the "Board") both expressly state that Dr. Hicks was hired to be the "Head of School" and "leader of the School".

2.    The Board and each of its individual Trustees had a non-delegable fiduciary duty of the highest order to treat Dr. Hicks, as the Head of School, fairly and in good faith and to exercise reasonable care in discharging the contractual duty to "nurture, evaluate, retain, and terminate" the Head of School, per the express terms of the Board's bylaws and Dr. Hicks's contract.  The Board and each of its individual Trustees failed utterly in this regard, in violation of the bylaws, the school's contractual duties to Dr. Hicks under his contract of employment, and in dereliction of the Board and each member's fiduciary duties.

3.    The Board fired Dr. Hicks, purportedly pursuant to a "for cause" provision of his employment agreement, following a fundamentally flawed investigation into a grab bag of allegations that were false, lacked context, and objectively provided no justification whatsoever for his termination. It now appears most likely that the Board's ultimate decision to terminate Dr. Hicks "for cause" was contrived to escape its contractual obligation to provide the severance payment that would have been due to Dr. Hicks had he been terminated "without cause."

4.    Months after being placed on leave, following the repeated urging of Dr. Hicks's attorneys, the Board's investigator disclosed the specific areas of her inquiry.  Her cursory response took the form of 12 disparate and perplexing bullet points largely comprised of what appeared to be administrative items, such as: "Faculty housing and Covid policies," "Meetings," "Faculty Senate," "Faculty Disciplinary issues," and "Relationships with donors."

5.    Though Dr. Hicks had been initially told that this investigation was about "sexual harassment, discrimination, and unethical behavior" stemming from "employee concerns," upon disclosure of this investigative agenda it seemed that it was about something else altogether.

6.    That something else became clearer when Dr. Hicks was finally interviewed. The questions posed by the investigator (and the reasons for termination later cited by the Board) amply demonstrate that a small group of senior employees were dissatisfied with a range of management decisions Dr. Hicks had made with the Board's knowledge and consent. These self-interested employees saw Dr. Hicks's management decisions as adverse to their professional ambitions. In retaliation, they manufactured false claims, including murky allegations suggestive of "sexual harassment, discrimination, and unethical behavior," to serve their own nefarious purposes.

7.    The Board and its members were duty bound to carefully evaluate the allegations made by these employees and to consider the true motivations underlying them, rather than uncritically accept them as evidence and "good cause" for firing the Head of School.   The Board's failure in this regard is especially egregious given the fact that the Trustees had ample evidence— much of it direct and first-hand—to know that many of the complainants' allegations were objectively false, based on false premises, radically far-fetched, or intentionally misleading.

8.    Stevenson's investigation of these implausible allegations and its subsequent decision to terminate Dr. Hicks's employment was a charade of due process that (1) left Dr. Hicks completely in the dark as to what charges were being made against him and by whom, (2) improperly relied on "any evidence" rather than "substantial evidence" of the alleged misconduct, (3) gave Dr. Hicks no meaningful opportunity to respond directly to the Board before any decision was made, and (4) culminated in a neglectful, inadequately deliberated decision by the Board to fire Dr. Hicks.

9.    Rather than carefully and dispassionately discover and interrogate the full scope of evidence before coming to a reasoned conclusion, as the law and their fiduciary duties required them to do, the Board appears to have merely rubber stamped their investigator's report—a report which was either a cynical or credulous repackaging of the complainants' false allegations.

10.    The resulting damages to Dr. Hicks and his family have been immense. In material terms, they most certainly include damages flowing from the complete destruction of Dr. Hicks's career.  Owing to Stevenson's distinctive tradition of long-serving Heads of the School and Trustees' recurring explicit private and public statements to Dr. Hicks and others, Dr. Hicks reasonably

3

COMPLAINT

understood that his employment at Stevenson would most likely continue until his retirement, which he planned to begin at age 70.

11.    Instead, in validating the complainants' version of the "Big Lie," the Board betrayed Dr. Hicks making it impossible for him to ever work in any executive or supervisory capacity again. Dr. Hicks has also incurred hundreds of thousands of dollars in legal fees. Additionally, the Board has also done irreparable harm to the sterling reputation for personal integrity that Dr. Hicks spent a lifetime building, within and well beyond the extended Stevenson community. By and through this lawsuit, Dr. Hicks seeks to be fully compensated for the complete destruction of his career, his legal fees, and the catastrophic damage done to his reputation.

## THE PARTIES

12.    Plaintiff Kevin Hicks is a resident and citizen of the State of Idaho. At the time of his termination as Head of School he was 55 years old.

13.    Defendant Robert Louis Stevenson School is a non-profit corporation organized and existing under the laws of the state of California with its principal place of business in Monterey County, California.

14.    Defendant Board of Trustees of Stevenson is an unincorporated association of individuals organized and existing under the laws of the state of California with its principal place of business in Monterey County, California. Upon information and belief, the individual trustees (the "Trustees" and each a "Trustee") at all times relevant to the allegations of this Complaint were and are Cynthia Chapman, David Colburn, Madeleine Deininger, Courtney Harwood, Mark Hornberger, Jon Iwata, Michael Jackson, Ron Johnson, Jennifer Kirk, Vincent Ma, Steven Merksamer, Thomas Moran, Peter Nielsen, Tom Orradre, Bill Perocchi, Steve Packer, David Rosen, Susan Swick and Steve Zahm. The Trustees are collectively referred to herein as the "Board".

15.    The names of other Defendants and/or their involvement in this dispute are presently unknown to Plaintiff, who therefore sues such Defendants in this action by fictitious names. Each of the Defendants designated as a DOES 1-20 is legally responsible in some manner for the unlawful acts described above. Plaintiff will seek leave of the Court to amend this Complaint to reflect the true names and capacities of the DOE defendants as and when their identities become known.

4

COMPLAINT

16. Each Defendant is the agent, servant and/or employee of other Defendants and each Defendant was acting within the course and scope of his, her or its authority as agent, servant and/or employee of the other Defendants. Defendants, and each of them, are individuals or entities that joined in and conspired with the other wrongdoers in carrying out the tortious and unlawful acts described herein, and Defendants, and each of them, ratified those acts.

**JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332(a), because there is complete diversity of citizenship between the parties and more than $75,000, exclusive of interests and costs, is at stake.

18. Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in this judicial district because a substantial part of the events or omissions giving rise to this claim occurred in this district. Venue is also proper pursuant to 28 U.S.C. §1391(b)(3) because Defendants are subject to personal jurisdiction in California.

19. This Court has personal jurisdiction over Defendants based on Defendants' continuous and systematic minimum contacts with residents of California through the offerings of its services and/or products and involvement with residents of California, within this judicial district, and elsewhere.

**FACTUAL ALLEGATIONS**

**A.    Education and Employment History of Dr. Hicks**

20. Raised on the Monterey Peninsula, Dr. Hicks graduated from Stevenson in 1985. He received his BA in religious studies from Yale University (1989) and a PhD in English from Princeton University (2005).

21. Prior to returning to Stevenson, from 2010 to 2015, Dr. Hicks served as dean of faculty and then Head of School at The Hotchkiss School in Lakeville, CT. From 2005 to 2010, he served as dean of Berkeley College at Yale University, where he also taught in the English department.

22. Over the course of his exemplary thirty-year career, Dr. Hicks has taught, served as an administrator and admissions officer, and coached athletics at a range of other schools and

universities, including Princeton University, Brown University, Boston University, Trinity College, Bennington College, Endicott College, Wellesley High School, Middlesex School, Avon Old Farms, and The Peddie School.   Over more than seventeen years as an administrator, he established an international reputation as an educator and leader of unquestionable integrity.

**C.** **Dr. Hicks's Major Contributions to the Stevenson School Over the Course of Seven Years and His Subversion and Takedown By a Group of Disgruntled Employees**

23.    The Board selected Dr. Hicks as the school's fourth president in 2015 based on his capacity to lead and manage in complex environments in transition. In doing so, it recognized the vision, courage, ethical values, and acumen he had developed over his career, culminating in a decade of senior leadership roles prior to his appointment.

24.    A true and correct copy of Dr. Hicks's employment agreement (the "Employment Agreement") is attached hereto as Exhibit "A".  He took up his professional duties as Stevenson's fourth president—the first alum to hold that honor—in July 2015.   A true and correct copy of Dr. Hicks's remarks at his investiture in September 2015, which reflect Dr. Hicks's values and deeply felt commitment to Stevenson, is attached hereto as Exhibit "B".

25.    Conscious of the myriad challenges already facing or soon to confront Stevenson, the Board charged Dr. Hicks to improve the school's functioning—swiftly and durably—across all areas of its operation, and the Trustees promised him their full support.

26.    The Board's choice of Dr. Hicks to lead Stevenson was thoroughly validated by his undisputed record of success in leading the school over his seven years of employment, especially in terms of the school's reputation, financial health, and—most importantly—its practice of care for the social, ethical, and intellectual development of its students. In the face of incredible and unanticipated challenges—such as the complexities of the COVID-19 pandemic and the need to investigate, and then publicly and sensitively address alumni claims of historical employee sexual misconduct—Dr. Hicks achieved spectacular results for Stevenson on all fronts. In his last year of employment, Dr. Hicks raised more than $20 million dollars—by way of two separate donor gifts of $10 million dollars each—in support of the new science center he had long championed. The school had never previously received a gift greater than $1 million dollars.

COMPLAINT

27.    At all times, Dr. Hicks collaborated extensively and consistently with the Trustees. Through both formal and informal channels, he was unvaryingly frank about the obstacles he and the school were encountering. Dr. Hicks spoke with each Trustee at least quarterly to share information and seek their counsel.  He required that management share relevant financial and admissions data with the Board with far greater transparency and precision than had ever been the case previously. He invited generative discussion of potential solutions to problems long held to be intractable. Dr. Hicks encouraged the Trustees to improve their own governance practices— including the introduction of Trustee term limits, in keeping with the industry's best practices—and designed a robust framework that helped the Board make partial progress in this direction.

28.    Always in consultation with the Board, Dr. Hicks took responsibility for the difficult, sometimes unpopular strategic and operational decisions required to ensure fairness, equity, and safety for students and employees alike.

29.    Some of Dr. Hicks's work necessarily involved regularly revisiting and clarifying individual employees' and groups' roles and responsibilities to eliminate "mission creep" and the ambiguous forms of power that prevailed upon his arrival. Dr. Hicks was unfailingly accountable for the consequences of the change management process which he was hired to implement and oversee. This work sometimes required difficult conversations with employees who unavoidably felt strained by the long-overdue paradigm shift these structural and cultural changes required.

30.    The Board regularly expressed appreciation for Dr. Hicks's firm but compassionate approach and lauded his progress. Not once in seven years did a Trustee voice disapproval to Dr. Hicks about any aspect of his work.

31.     In response to Dr. Hicks's repeated requests for the Board to conduct a formal evaluation process of him, the Board's recurring answer was that he should design an expedient process with which he was comfortable, implement it, and report the results to them in whatever form he saw fit. In each instance, Dr. Hicks responded that for him to personally oversee such a check-the-box approach would be antithetical to the industry's principles of good practice as well as the school's by-laws. He further explained—presciently, as it turns out—that formal performance evaluations of the Head of School carefully overseen by the Board provide an important measure of

protection, for the Board and the Head of School, in a range of circumstances. But the trustees never acted.

32.    In his role, one of Dr. Hicks's important duties was to provide both direct guidance and meaningful and critical feedback to the senior administrators who reported directly to him.  The quality and effectiveness of the school's operations undeniably benefited from his dedicated mentoring and articulation of high standards.

33.    But a small group comprised of senior administrators and long-serving employees—some of them intimate friends to one another whose tenure at the school preceded Dr. Hicks by many years—was unrepentantly ambivalent about the changes he and the Board agreed were necessary to ensure the school's steady, incremental progress.  These colleagues were entrenched in dysfunctional modes and habits that they struggled to acknowledge, much less remediate, and were hampered by their loyalties to one another rather than to the school and its students.

34.    As a result, these individuals required a considerable amount of Dr. Hicks's supervision. Some eventually chose or were encouraged to move on to new opportunities. But in working patiently with those who he chose to retain in their roles, Dr. Hicks never lost confidence in their capacity to ultimately contribute to the school's progress. He remained actively and optimistically engaged in their professional development, trusted their claims of good faith—even in the face of what sometimes appeared to be their passive resistance—and consistently extended to them his support and the benefit of the doubt.

35.    It is now apparent that within this subset of employees, several were hurt by the constructive criticism that it was Dr. Hicks's duty to provide and were troubled by the sense of inadequacy that it triggered. Their self-serving ambitions were thwarted by Dr. Hicks's refusal to appoint them to the new and needless administrative roles they were proposing for themselves, in each case with the expectation of higher compensation, expanded authority, and reduced performance expectations.

36.    These employees resented Dr. Hicks's reduction of the unfair privileges they had long enjoyed relative to their colleagues, were jealous of more adaptive or qualified colleagues who they saw as their emerging rivals, were anxious about the ramifications of Dr. Hicks's reasonable

8

expectations for their performance, and worried that their thinly-veiled opposition to the course that he and the Board were developing for the school might eventually cost them their jobs. They consoled themselves and one another by counting themselves persecuted and victimized.

37. In response, they could have chosen one of three legitimate professional options: 1) develop the skills required to lean into change; 2) address their concerns with Dr. Hicks directly; or—failing all else—3) seek work elsewhere. Instead, this self-interested group banded together and chose the coward's path. They secretly undermined Dr. Hicks's heretofore healthy relationships with other employees, manipulating them to feel vulnerable and at risk, and then took advantage of the anxiety they had cultivated to recruit these colleagues into their dysfunction.

38. The false allegations this small group ultimately concocted against Dr. Hicks were a disguise for the true source of their displeasure: their indignant outrage with change management decisions that the Board had hired Dr. Hicks to make and had supported.

39. That their allegations are false should have been decisively established by Dr. Hicks's forthright responses to the investigator's questions. To an unbiased eye, his explanations restored the context that the complainants artfully elided to generate their false tales. Furthermore, his responses firmly established that most of the complainants' allegations pertained to valid management decisions squarely within Dr. Hicks's purview.

40. That their allegations are false should also have been established by the Trustees' review of emails and other electronic documents Dr. Hicks was prevented from providing himself owing to the school's suspension of his computer access, and by interviewing the current and former school employees who Dr. Hicks identified to the investigator as people who could corroborate his responses.

41. That the allegations are false should also have been recognized by the Board members to whom Dr. Hicks had consistently turned for support in navigating complex personnel management issues, and who had no reason to be so unfamiliar with the school's policies and practices that they should have been easily persuaded into thinking that, for example, there are rules that preclude the Head of School from reviewing students' academic information, or hosting boarding students for dinner at his residence, or that prohibit his wife from playing tennis with a

9

COMPLAINT

student on the school's tennis courts—all of which were the basis for allegations of Dr. Hicks's misconduct.

42.     But if the allegations are so clearly flawed, one might ask, how did this cabal's scheme succeed?  Though much about the chain of events remains shrouded in mystery (including the question of precisely when the complainants may have first begun to cultivate and leverage secret alliances with one or more receptive Trustees and former school employees), some of the answers to this question are now appreciably clear. The plot succeeded because the Trustees:

- Never questioned their stunningly naïve assumption that the complainants—and the followers the complainants enlisted in their cause and exploited for their own benefit—were acting in good faith rather than selfishly and vindictively.

- Did not understand their individual and shared obligations as fiduciaries and had no established process to guide them in the singular circumstance of allegations against the Head of School.

- Refused to speak with Dr. Hicks directly and kept him from accessing exculpatory electronic records.

- Failed to consult with the school's primary general counsel before placing Dr. Hicks on leave. Given this attorney's experience and expertise in the world of independent schools, and access to relevant experts, he almost certainly would have helped the Board navigate the complexities of these allegations in a way that could have preserved Dr. Hicks's career and reputation once he was exonerated.

- Needlessly announced Dr. Hicks's leave publicly and in a mysterious way that invited wild speculation locally and internationally and thus caused irreparable damage to his reputation, regardless of the investigation's outcome.

- Failed to honor their duty to regularly evaluate Dr. Hicks's performance.

- Essentially permitted a handful of mutineers, who had secretly cultivated inappropriate relationships with individual Trustees, to conduct a rigged version of Dr. Hicks's performance evaluation themselves. These employees did not want to be managed, wanted more power and money, and sought to punish Dr. Hicks for not

10

COMPLAINT

responding favorably to their self-interested schemes. The trustees, individually and collectively, failed in their fiduciary duties by allowing this group to dictate the terms and results of what amounted to a de facto evaluation process, and by acting on the investigator's unsupportable conclusions with an utterly negligent absence of due process and critical thinking.

43. For seven years, with unwavering courage, conviction, and compassion, Dr. Hicks collaborated closely with the Board and consistently sought the Trustees' counsel and support along the way. He knew that the changes he was hired to implement would complicate his relationships with a subset of employees who were desperate to maintain their unfair and unsustainable privileges.

44. The Board promised Dr. Hicks its backing. But instead of protecting him—in this instance by way of the swift, thorough, and fair investigation that would have exposed the complainants' allegations as false—the Trustees abetted the destructive forces that they had charged him to address, thus ending his impeccable thirty-year professional career and visiting traumatic duress and irreparable damages on Dr. Hicks and his innocent family.

**D.    Investigator's Inadequate Investigation of Allegations of Misconduct Against Dr. Hicks**

45. In the early morning hours of August 22, 2022, Dr. Hicks was called out of the blue by David Colburn and Cynthia Chapman—the Board's chair and vice-chair, respectively—who informed Dr. Hicks that he was being placed on immediate "administrative leave" pending an investigation into "employee concerns" regarding "sexual harassment, discrimination, and unethical behavior."

46. The call came as a total shock to Dr. Hicks. He had no clue as to the identity of the complainants and couldn't think of a single incident with an employee that could provide the warrant for such complaints.

47. The stated terms of Dr. Hicks's leave included: no access to school email or electronic records, confinement to his residence, and direction to neither speak nor correspond with any school employees, students, or Trustees other than Mr. Colburn. It is now clear that the Board applied these measures because the complainants accompanied their false claims with the

outrageous and expedient fiction that they feared that Dr. Hicks would retaliate against them, which is ludicrous on its face.

48. Dr. Hicks respected and supported the Board's fiduciary duty to sort out whatever was going on. He understandably expected to be fully exonerated and cleared of any charges made against him. Dr. Hicks therefore readied himself to cooperate fully and honored the Board's non-binding request that he remain silent.

49. Two days later, on Friday of that week, the Hicks's only child—a daughter enrolled in Stevenson's middle school—was put at considerable risk by the Board's needless and mystifying decision to publicize Dr. Hicks's leave to the community without any advance notice to Dr. Hicks and his wife.

50. In the wake of this surprising and cryptic public announcement—which quickly found its way to the local newspaper and predictably incited a flurry of adverse gossip and vicious rumors—Dr. Hicks and his wife's distress peaked when no one from Stevenson's middle school reached out to help them think through how to protect their daughter's well-being when classes resumed on Monday. The school's dereliction of duty was keenly painful to Dr. Hicks because, as the Head of School, he had always ensured that if an employee was in the kind of trouble that might cost them their job, their enrolled children would continue to feel safe and secure at school.

51. Suddenly and gravely concerned that the investigative process was already off the rails and its outcome was perhaps predetermined (and having no idea how long it might take to establish his innocence), Dr. Hicks and his wife had to put their daughter's needs for safety and well-being at the center of their decision-making.

52. Most urgently, they had to find her a new school and surrounding community where she would not be at risk of idle and speculative gossip, bullying by peers, and misconduct by complainants, some of whom might have access to her at school. The idea of remaining confined to "house arrest" and enrolling her in a local middle school, where she'd likely face harassment related to the investigation, was untenable. With the blessing of Dr. Hicks's mother, Dr. Hicks's wife and daughter relocated out of state to his mother's second home and enrolled their daughter in a local middle school. The family's initial plan was that Dr. Hicks's wife and daughter would return to

Stevenson following Dr. Hicks's exoneration, which they still hoped would be the ultimate result of a fair and thorough investigation.

53.     Over the next two months, the only contact from Stevenson was an invitation for Dr. Hicks to resign conveyed by the school's counsel.  This he refused to do because he knew he was innocent. As Dr. Hicks eagerly awaited his opportunity to meet with the investigator (but heard nothing), he traveled back and forth to the Monterey Peninsula several times to see his mother, who had been diagnosed with terminal cancer in mid-July, and to offer what support he could to his brother and his brother's wife as they tended selflessly to her daily care and comfort. Dr. Hicks's mother passed away on October 12, 2022.

54.     Dr. Hicks and his counsel remained puzzled as to what the possible allegations and claims made against him could possibly be and therefore they requested that the investigator hired by Stevenson (a lawyer from Seattle named Sheryl Willert) send them a list of the areas of discussion for Dr. Hicks's interview.  After initially resisting, Ms. Willert eventually sent a memo that listed the following areas (the memo is replicated below in full):

*Areas of Discussion with Dr. Hicks:*

*1)     Comments of a sexual or gender based nature which could have been or were perceived by those to whom they have been directed or who were present as inappropriate and a potential violation of the schools policies.*

*2)     Physical contact with female employees other than his wife.*

*3)     Senior Leadership team since he has been employed at Stevenson School.*

*4)     His method of communication with staff, faculty other employees?*

*5)     His role in the enforcement of and compliance with policies and procedures, including but not limited to the Code of Ethical Conduct, Confidential Information, DEI, Faculty Housing and Covid Policies*

*6)     Certain hiring and furlough decisions.*

*7)     Management style?  Meetings?  Frequency of interactions?*

*8)     Faculty Senate.*

*9)     Faculty Disciplinary issues.*

13
COMPLAINT

10)    *Relationship with Donors?*

11)    *Access of Staff to Board of Directors.*

12)    *Other areas the investigator deems relevant.*

55.    As this memo clearly indicated, the investigation—contrary to the Board's initial explanation of the grounds for his leave—would take the form of a wide-ranging inquiry into Dr. Hicks's management style and decisions.

56.    Ms. Willert finally interviewed Dr. Hicks on October 24th. Though she had asked to meet two weeks earlier, he had requested that the interview not be scheduled in what he anticipated and proved to be the last week of his mother's life or immediately following her death, which came on October 12. Immediately, his worst fears were confirmed. Despite being more than two months into her investigation, Ms. Willert still seemed to have no context for many of her questions. She was staggeringly unfamiliar with Stevenson. She admitted to having never seen Stevenson's organizational chart and was unfamiliar with most senior administrators' names, titles, and responsibilities. Dr. Hicks had to provide those to Ms. Willert during his interview—spelling out their names—and she struggled to keep their names straight during the course of the interview.

57.    Additionally, Ms. Willert demonstrated no understanding of Stevenson's recent history or independent secondary school culture and practices (specifically those associated with boarding schools). As but one example, Ms. Willert seemed fixated on events and relationships that anyone familiar with boarding school culture would view as healthy, expected, and necessary adult engagement with students. For example, she seemed confused as to why Dr. Hicks and his wife hosted groups of students for dinners and special events at their residence and was suspicious as to why his wife occasionally played tennis with a student. Dr. Hicks's wife had been a collegiate player; the student was the girls' varsity tennis team's top player, eager to practice with a worthy competitor. They were introduced to one another for this purpose by the school's athletics director.

58.    Questions such as these left Dr. Hicks and his attorneys befuddled as to what possible relevance they had or have to any investigation for alleged sexual harassment and discrimination. On several occasions, Ms. Willert struggled to find the question she wanted to ask. Some of her questions were framed so opaquely that it was difficult for Dr. Hicks to intuit their implications.

14

COMPLAINT

When Dr. Hicks's attorneys asked clarifying questions, her responses were defensive. Of greatest concern, though, was that her questions were clearly based entirely on her wholesale acceptance of the anonymous complainants' false tales, misleading premises, misinformation, and ignorance of personnel and administrative matters beyond the complainants' purview.

59. In response to Ms. Willert's questions regarding allegations of "inappropriate comments," Dr. Hicks forthrightly provided the missing context that the complainants had deceitfully elided from their stories. He explained that their redactions of indisputable facts were obviously intended to create an illusion of his misconduct. He also pointed to other employees who would corroborate his statements and identified specific forms of exculpatory evidence. Dr. Hicks still does not know if Ms. Willert followed up on these responses.

60. In response to Ms. Willert's question about physical contact with female employees—a complaint that she later reduced to one sole allegation of Dr. Hicks having touched someone's leg at a public reception—Dr. Hicks flatly denied the allegation. Though Ms. Willert would not share the name of the employee, or the date or location of this alleged encounter, Dr. Hicks explained to Ms. Willert that he could deny the allegation with complete confidence because he had never initiated physical contact—other than a handshake—with any employee at any point in the entirety of his professional career.

61. At both this nine-hour long face-to-face meeting and a two-hour follow-up meeting conducted virtually, Dr. Hicks responded to Ms. Willert's questions forthrightly and expansively. However, because his access to school email and other electronic records remained suspended as a function of his leave, he was never allowed to share corroborating correspondence and documents. The unfairness of this asymmetry was striking given that the still-anonymous complainants had months (if not years) to draft and revise their false allegations.

62. Ms. Willert insisted that her own written notes would be sufficient for her investigation's purposes and refused Dr. Hicks's attorneys' request to electronically record the interview. As the conversation unfolded, Dr. Hicks and his attorneys observed with increasing concern that Ms. Willert's practice of transcription was conspicuously intermittent and clearly not verbatim. Dr. Hicks was never provided a record of what Ms. Willert actually recorded and still has

15
COMPLAINT

no idea if she: 1) accurately noted the names of the numerous colleagues and Trustees he put forth as corroborating witnesses, 2) interviewed them, or 3) posed similarly opaque or leading questions to these colleagues and Trustees that would impede them from providing exculpatory answers.

**E.    The Board's Uninformed, Uncritical and Unreasonable Decision to Terminate the Employment of Dr. Hicks**

63.    One hundred days after Dr. Hicks was placed on leave and forty days after his first interview with the investigator, he was informed that the Board would meet on December 2, 2022, to receive Ms. Willert's final report and to vote on an outcome.  Dr. Hicks wrote a letter to Mr. Colburn to express his concerns regarding the fairness and thoroughness of such an approach. He requested that he be permitted to meet with the Trustees to finally learn the full extent of the allegations, to ensure that his responses to the investigator's questions had been shared with them, and to answer their questions directly. He asked Mr. Colburn to share his letter with the full Board.

64.    On December 2, 2022, the Board met and reviewed the final report.   At 5:44 p.m. of that same day, Dr. Hicks was sent an email from Mr. Colburn stating only "Please see attached." Attached to the email was a letter addressed to Dr. Hicks from Mr. Colburn informing Dr. Hicks that the Board had voted unanimously to terminate his employment, effective immediately.

65.    The letter stated that "in August 2022, the Board received a complaint alleging that you engaged in harassment, retaliation, and unethical conduct.  An investigation into these allegations was conducted by an outside investigator.  A letter explaining the investigator's findings is attached hereto as Exhibit A.  As set forth in Exhibit A, the investigator found that you engaged in multiple acts of sexual harassment and at least one act of retaliation."

66.    Far from presenting "substantial evidence," Mr. Colburn's letter referenced isolated, trivial allegations, all of which were either patently false or devoid of explanatory context. None of the allegations took account of Dr. Hicks's thoroughly plausible explanations and citations of exculpatory evidence.

67.    That same evening, three hours later, at 8:54 p.m., a blast email with the subject line "Important Update from the Chair of Stevenson's Board of Trustees" was sent to the entire Stevenson community.  The email reads, in part,

"Dear Stevenson Community,

Previously we shared with you that Dr. Hicks was being placed on temporary administrative leave while the Board commissioned an independent inquiry into certain employee concerns.

The Board of Trustees met today to discuss the findings following the conclusion of the independent inquiry. After review, the Board has determined that it is time for new leadership at Stevenson.

Since September, Dr. Daniel Griffiths has graciously served as our Acting President, and today the Board is pleased to share that Dr. Griffiths has accepted our offer to be the next President of the School.

68.     The fact that the announcement of Dr. Griffiths' appointment could be made on the same day that the Board received, reviewed, and deliberated the investigator's final report raises significant concerns regarding the timing and process of the Board's decision-making. This rapid transition suggests that negotiations with Dr. Griffiths may have commenced prior to the Board's official review of the report, indicating that the outcome regarding Dr. Hicks's employment was predetermined. Such circumstances reveal that the purported investigation served merely as a procedural formality, and the decision to remove Dr. Hicks had already been made, with the investigation functioning as a pretext to justify the Board's actions. Once again, this was an instance of an employer that had improperly already made up its mind and was merely using the charade of an investigation as a pretextual cover for its decision.

## FIRST CAUSE OF ACTION

(Breach of Contract)

(Against Defendant Robert Louis Stevenson School)

69.     Plaintiff re-alleges and incorporates each and every allegation contained in paragraphs 1 through 68 as if set forth fully herein.

17

COMPLAINT

70.    Plaintiff and Defendant entered into a valid and enforceable employment agreement (the "Employment Agreement") attached hereto as Exhibit "A".

71.    Plaintiff performed all of the obligations, covenants, and conditions required of him under the Employment Agreement, except to the extent any such obligations, covenants or conditions have been excused, prevented or waived by Defendant's acts and/or omissions.

72.    The Employment Agreement has provisions pursuant to which Defendant was permitted to terminate Plaintiff without cause or with cause.   However, the Employment Provision without cause provision requires Defendant to either provide Plaintiff with 24 months' notice of its decision to terminate or, in lieu of such notice, pay Plaintiff 24 months' of his full salary and benefits.

73.    Stevenson elected not to invoke this provision and instead invoked the "with cause" provision. That provision of the Employment Agreement reads as follows:

(ii) Termination by the School For Cause. The Board may terminate Head's employment at any time for "Cause" (as defined below) by vote of a two-thirds majority of the full Board (not including the Head of School) and upon written notice to Head describing in reasonable detail the nature of the Cause and the facts giving rise to it.  In the event Head is terminated for Cause, his employment shall cease immediately, and he shall not be entitled to any further compensation or benefits as Head of School beyond termination, except for payment of Base Salary for periods.

In turn, the Employment Agreement defines "cause" as follows:

(iii) Definition of Cause. For purposes of this Agreement,

"Cause" means that the Head has engaged in or committed any of the following: (i) willful misconduct; (ii) gross negligence; (iii) theft, fraud or other illegal conduct; (iv) refusal or unwillingness to perform his material duties; (v) dishonesty in performing his job duties; (vi) material violation of the School's material written policies or rules; (vii) conduct which reflects adversely upon, or making any remarks disparaging of, the School or its Board (provided that this shall not prevent the Head from providing constructive criticism to the Board in any executive session of the Board or other private meeting; (viii) insubordination;

18

COMPLAINT

(ix) conviction of ( or pleading nolo contendere to) a felony or any crime involving an act of dishonesty, moral turpitude, deceit or fraud; (x) any willful act that is likely to and which does in fact have the effect of injuring the reputation, business, or a business relationship of the School; (xi) violation of any fiduciary duty or duty of loyalty to the School; and (xii) material breach of any of the material terms of this Agreement, provided, however, that any violation of clauses (iv), (vi), (xi), or (xii) shall constitute Cause only if the Head has first been provided written notice of the alleged violation and has failed, within 15 days of his receipt of such notice, to cure such violation.

74.    Defendant breached the Employment Agreement by terminating Plaintiff without providing reasonable detail of the nature of the facts giving rise to the alleged "Cause" and, in any event, without adequate "Cause" as defined under the foregoing provision and without notice to cure any alleged violation and by failing to pay Plaintiff for amounts due to him for a termination other than for Cause.

75.    Plaintiff has been damaged as a direct and proximate result of Defendant's breach in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

(Breach of the Implied Covenant of Good Faith and Fair Dealing)

(Against Defendant Robert Louis Stevenson School)

76.    Plaintiff re-alleges and incorporates each and every allegation contained in paragraphs 1 through 79 as if set forth fully herein.

77.    Inherent in the Employment Agreement between Plaintiff and Defendant was an implied covenant of good faith and fair dealing.

78.    This implied covenant of good faith and fair dealing included an obligation that both parties to the Employment Agreement would do all things reasonably contemplated by the contract's terms to accomplish its goals, and to refrain from doing anything that would destroy or injure another party's right to receive the fruits of the contract. The covenant of good faith and fair dealing further required that parties act in a way to effectuate the contract's purposes and promises, and to protect the parties' legitimate expectations based upon the terms of the contract.

19

COMPLAINT

79. Defendant breached the covenant of good faith and fair dealing by terminating Plaintiff's employment purportedly for "Cause", where in fact no Cause as defined in the employment agreement existed for termination, and thereafter failing and refusing to pay Plaintiff for amounts due to him for a termination other than for Cause.

80. Plaintiff was damaged as a direct and proximate result of Defendant's breach in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

(Breach of Fiduciary Duty)

(Against Defendant Board of Trustees of Robert Louis Stevenson School)

81. Plaintiff re-alleges and incorporates each and every allegation contained in paragraphs 1 through 81 as if set forth fully herein.

82. Defendant Board and its individual members – Cynthia Chapman, David Colburn, Madeleine Deininger, Courtney Harwood, Mark Hornberger, Jon Iwata, Michael Jackson, Ron Johnson, Jennifer Kirk, Vincent Ma, Steven Merksamer, Thomas Moran, Peter Nielsen, Tom Orradre, Bill Perocchi, Steve Packer, David Rosen, Susan Swick and Steve Zahm – owed a direct fiduciary duty to Plaintiff Hicks. This duty arose not merely from an employment relationship, but from a unique, sui generis relationship of special trust, confidence, and vulnerability that Defendants actively cultivated and Plaintiff justifiably relied upon.

83. The existence of this fiduciary duty is established by, among other things, the following:

  a. Unique Status: The Board's own bylaws deliberately distinguish the Head of School from other employees, stating he is "not a corporate officer of the School but the leader of the School." By designating Plaintiff as "Head of School" and the "leader of the School," Defendants acknowledged he was the embodiment of the School and its mission, to whom their own fiduciary duties to the School necessarily extended.

  b. Express Assumption of Duty: The Board's bylaws contractually obligated the Board Defendants to do more than merely hire and fire; they assumed an express, affirmative duty to "nurture, evaluate, retain, and terminate" the Head of School. The

20

COMPLAINT

duty to "nurture" implies a standard of care, good faith, and development far exceeding that of a typical employment relationship.

c. Inducement and Reliance: Defendants actively recruited Hicks, inducing him to leave a prestigious and secure position as Head of The Hotchkiss School. To secure his acceptance, Defendants represented that his tenure would be "measured in decades," consistent with his predecessor's 32-year term, and that they were committed to supporting him for his career-long tenure.

d. Vulnerability and Control: In reliance on these representations, Plaintiff uprooted his family and accepted the position, placing his entire professional reputation and future livelihood in the exclusive hands of the Board. This created a relationship of "peculiar trust and confidence," defined by a severe power imbalance, wherein the Board held complete control over Plaintiff's ability to perform his duties and maintain his professional standing.

84.    The Board and Board Defendants, and each of them, breached their fiduciary duties of loyalty, good faith, and due care owed to Plaintiff Hicks. These breaches include, but are not limited to, the following acts and omissions:

a. Failure to "Evaluate" or "Nurture": Defendants completely failed to honor their bylaw duty to "evaluate" Plaintiff. Despite Plaintiff's repeated requests over seven years, the Board never once conducted a formal performance evaluation, leaving Plaintiff vulnerable to the exact kind of pretextual attack he ultimately suffered.

b. Sham Investigation: Defendants breached their duty of care by initiating and relying upon a farcical and fundamentally flawed investigation as a pretext for Plaintiff's termination.

c. Failure of Inquiry:  Defendants acted with gross negligence and in bad faith by uncritically accepting frivolous allegations from a small group of disgruntled employees without conducting any reasonable inquiry into their true motivation, which was to subvert Plaintiff's management decisions which had been shared with and approved by the Board.

21
COMPLAINT

d. Improper Delegation: Defendants improperly and negligently delegated their non-delegable fiduciary duty to "evaluate" and "terminate" Plaintiff to an outside investigator and the disgruntled employees, whose conclusions the Board merely "rubber-stamped."

e. Denial of Due Process: In violation of their duties of good faith and fair dealing, Defendants conducted a charade of due process. They kept Plaintiff completely in the dark as to what charges were being made against him; denied him access to his own electronic records to find exculpatory evidence; and refused his direct plea to meet with the full Board to present his side of the story before his termination.

f. Predetermined Outcome: Defendants acted in bad faith by deciding to terminate Plaintiff before their review was even complete. The Board already made up its mind, as evidenced by the fact that on December 2, 2022, it met to review the report, voted to terminate Plaintiff, and appointed his successor, Dr. Daniel Griffiths, all within a matter of hours.

g. Bad Faith Pretext: Defendants further breached their duty of good faith by terminating Plaintiff "for cause" as a mere pretext to improperly avoid their contractual obligation to pay Plaintiff 24 months of salary and benefits, to which he was entitled under the "without cause" provision of his Employment Agreement.

85. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiff Hicks has been irreparably harmed.

86. As a further direct and proximate result of these breaches, Plaintiff Hicks has sustained, and will continue to sustain, substantial damages. These damages include, but are not limited to, the loss of his position, salary, benefits, and future earning capacity, in an amount believed to be in excess of $17 million, as well as catastrophic and permanent damage to his sterling reputation, which has rendered him unemployable in his chosen profession.

87. Defendants, and each of them, committed the acts and omissions alleged herein with malice, oppression, and fraud, demonstrating a willful and conscious disregard for Plaintiff's rights. Defendants' conduct was intended to, and did, cause Plaintiff severe injury. Plaintiff is therefore

22

COMPLAINT

entitled to an award of exemplary and punitive damages in an amount sufficient to punish and make an example of Defendants.

## FOURTH CAUSE OF ACTION

(Fraud – Intentional Misrepresentation)

(Against all Defendants)

88. Plaintiff re-alleges and incorporates each and every allegation contained in paragraphs 1 through 88 as if set forth fully herein.

89. Defendants, and each of them, made material representations of fact to Plaintiff that were false. On or about August 22, 2022, Defendants, through the Board's chair and vice-chair, represented to Plaintiff that he was being placed on administrative leave pending an investigation into "employee concerns" regarding "sexual harassment, discrimination, and unethical behavior." Implicit and explicit in this representation was that the investigation would be conducted fairly, impartially, and in good faith, and that Plaintiff would be afforded a meaningful opportunity to respond to any allegations against him before any adverse action was taken. These representations were false when made. As evidenced by the Board's subsequent conduct—including its appointment of Dr. Hicks's replacement within hours of purportedly reviewing the investigator's final report— Defendants had already predetermined the outcome of the investigation and intended to terminate Plaintiff regardless of the investigation's findings.

90. At the time Defendants made the foregoing representations, Defendants knew the representations were false, or Defendants made the representations recklessly and without regard for their truth. Defendants knew that the investigation was a predetermined charade, knew that the allegations against Plaintiff were baseless and manufactured by a small group of disgruntled employees with personal grievances, and knew that the purported grounds for termination did not satisfy the contractual definition of "Cause." Defendants' true purpose was to manufacture a pretext to avoid their contractual obligation to pay Plaintiff twenty-four months of salary and benefits upon a termination without cause.

91. Defendants made the foregoing representations with the intent to induce Plaintiff's reliance thereon. Defendants intended that Plaintiff would accept the representations at face value,

COMPLAINT

cooperate with the investigation, refrain from seeking alternative employment or taking other protective measures, and submit to the sham process that Defendants orchestrated.

92. Plaintiff actually and justifiably relied on Defendants' false representations. In reliance on Defendants' representations regarding the investigation, Plaintiff cooperated fully, honored the Board's request for silence, and refrained from taking steps to protect his reputation or seek alternative employment. Plaintiff's reliance was justifiable given Defendants' positions of trust and authority, the fiduciary relationship between the parties, and Defendants' repeated assurances of support.

93. As a direct and proximate result of Defendants' intentional misrepresentations, Plaintiff has suffered, and continues to suffer, substantial damages. These damages include, but are not limited to: loss of his position and the salary and benefits attendant thereto; loss of future earning capacity in excess of $17 million, based on Plaintiff's reasonable expectation that his employment would continue until his retirement at age 70; catastrophic and permanent damage to his sterling reputation, rendering him unemployable in his chosen profession; emotional distress, humiliation, and mental anguish; and hundreds of thousands of dollars in legal fees and costs. The precise amount of these damages will be proven at trial.

94. Defendants' conduct, as alleged herein, was willful, wanton, malicious, and oppressive. Defendants acted with a conscious disregard for Plaintiff's rights and with the intent to injure Plaintiff and deprive him of the benefits to which he was contractually entitled. Defendants' conduct constitutes fraud, malice, and oppression within the meaning of California Civil Code section 3294. Accordingly, Plaintiff is entitled to an award of punitive damages in an amount sufficient to punish Defendants and to deter Defendants and others from engaging in similar conduct in the future.

**FIFTH CAUSE OF ACTION**

(Failure to Pay Wages Upon Termination – Cal. Labor Code §§ 201, 202, 203)

(Against Defendant Robert Louis Stevenson School)

95. Plaintiff re-alleges and incorporates each and every allegation contained in paragraphs 1 through 94 as if set forth fully herein.

24

COMPLAINT

96. Defendant failed to pay all wages due at the time of termination. Specifically:

a. Severance as Wages: Defendant failed to pay the twenty-four (24) months of salary and benefits which vested as earned wages upon termination without Cause.

b. Accrued Vacation/PTO: Plaintiff is informed and believes that Defendant failed to pay Plaintiff's full final accrued vacation and/or Paid Time Off (PTO) balance at the time of termination.

c. Invalid Deductions During Leave: To the extent Defendant deducted vacation/PTO hours from Plaintiff's balance during his administrative leave (August 22, 2022 – December 2, 2022), such deductions were invalid because Plaintiff was "confined to his residence" and subject to Defendant's control, rendering that time ineligible as "vacation."

97. Defendant cannot claim a "good faith dispute" as to whether these wages were due, because Defendant's determination that Plaintiff was terminated for "Cause" was pretextual, arbitrary, and made in bad faith. Specifically:

a. Pretextual Motive: Upon information and belief, Defendant's decision to label the termination as "for Cause" was contrived specifically to escape its contractual obligation to pay the substantial severance owed to Plaintiff under the "without cause" provision of the Employment Agreement.

b. Lack of Substantial Evidence: The Board relied on a grab bag of allegations that were objectively false, lacked context, and did not meet the definition of "Cause" (e.g., willful misconduct or gross negligence) as defined in the Employment Agreement.

c. Predetermined Outcome: The investigation relied upon by Defendant was a "sham" and a "charade of due process". The bad faith nature of this determination is evidenced by the fact that Defendant had already hired Plaintiff's replacement, Dr. Daniel Griffiths, merely hours after purportedly reviewing the investigator's final report, indicating the decision to terminate and withhold wages had been made regardless of the investigation's findings.

25

COMPLAINT

d. Willful Ignorance: Defendant willfully ignored exculpatory evidence and corroborating witnesses offered by Plaintiff, and prevented Plaintiff from accessing school records to prove his innocence, thereby rendering any dispute regarding "Cause" unreasonable and legally unfounded.

98. As a direct and proximate result of Defendant's willful conduct, Plaintiff is entitled to:

a. Unpaid Wages: The principal amount of unpaid wages and severance benefits, estimated to exceed $1.7 million;

b. Waiting Time Penalties: Statutory waiting time penalties pursuant to California Labor Code § 203, calculated at Plaintiff's daily rate of pay for a period of thirty (30) days;

c. Prejudgment Interest: Interest on all due and unpaid wages at the legal rate pursuant to California Civil Code § 3287 and Labor Code § 218.6; and

d. Attorneys' Fees: Reasonable attorneys' fees and costs pursuant to California Labor Code § 218.5, as this action involves a claim for nonpayment of wages and benefits

**SIXTH CAUSE OF ACTION**

(Contractual and Statutory Indemnity Pursuant to California Labor Code § 2802)

(Against Defendant Robert Louis Stevenson School)

99. Plaintiff re-alleges and incorporates each and every allegation contained in paragraphs 1 through 98 as if set forth fully herein.

100. Under California Labor Code § 2802, Defendant is required to indemnify Plaintiff for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his duties. Plaintiff incurred substantial attorneys' fees and costs in the amount to be proven at trial (but estimated in the hundreds of thousands of dollars) during the period of August 22, 2022, through December 2, 2022, to defend his employment against Defendant's investigation.

101. These expenditures were necessary and incurred in direct consequence of the discharge of Plaintiff's duties. While Defendant initially characterized the investigation as relating to "sexual harassment", the actual inquiry conducted by Defendant's investigator (Sheryl Willert)

26

focused extensively on Plaintiff's operational and executive decisions, which are squarely within the scope of his employment. As documented in the investigator's own correspondence, the investigation scrutinized Plaintiff's "Senior Leadership team," "hiring and furlough decisions" "Faculty Senate" interactions, "Faculty Disciplinary issues," and "Relationship with Donors" .

102.    Plaintiff was required to retain counsel to explain and defend these valid management decisions against a hostile Board that sought to criminalize standard executive functions.

103.    To the extent the investigation addressed allegations of "harassment" or "unethical behavior," such allegations were objectively false, factually unfounded, and manufactured by third parties. Plaintiff's defense against these false charges (or his attempt to defend against them in a rigged process) and associated legal costs are indemnifiable as a matter of law.

104.    Retaining counsel was not optional but practically necessary because Defendant (a) cut off Plaintiff's access to school email and records needed to prove his innocence , (b) forbade him from speaking to Trustees, and (c) subjected him to a complex legal inquisition. Without independent counsel to navigate these prohibitions and gather exculpatory evidence, Plaintiff could not have participated meaningfully in the investigation.

105.    Plaintiff and Defendant further entered into a valid Employment Agreement (Exhibit A) which contains an express indemnification provision requiring the School to indemnify the Head of School for liability and costs incurred in connection with his service to the School.

106.    Defendant breached this provision by refusing to advance or reimburse the legal fees Plaintiff incurred to defend himself against the internal investigation and the threatened claims inherent in that process.

107.    The Employment Agreement's indemnity obligations are broader than the statutory requirements and cover the costs of defending against threatened litigation or administrative actions arising from his status as Head of School.

108.    Plaintiff has demanded reimbursement for these necessary expenditures and/or such demand would be futile as Defendant has refused or will refuse to pay. Plaintiff is entitled to:

      a.    Reimbursement of all attorneys' fees and costs incurred in defending against the investigation prior to his termination;

27

  b. Interest on these amounts at the legal rate from the date of expenditure; and

  c. Attorneys' fees incurred in enforcing this right to indemnity in the instant action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kevin Hicks prays for judgment against Defendants, and each of them, as follows:

**AS TO THE FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT:**

1. For compensatory damages in an amount to be proven at trial, including but not limited to twenty-four (24) months of salary and benefits owed to Plaintiff pursuant to the "without cause" termination provision of the Employment Agreement, estimated to exceed $1.7 million;

2. For consequential damages flowing from Defendant's breach, including lost future earnings and benefits;

3. For prejudgment interest on all sums due at the legal rate pursuant to California Civil Code section 3287; and

4. For costs of suit incurred herein.

**AS TO THE SECOND CAUSE OF ACTION FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING:**

1. For compensatory damages in an amount to be proven at trial;

2. For consequential damages, including lost salary, benefits, and future earning capacity;

3. For prejudgment interest on all sums due at the legal rate pursuant to California Civil Code section 3287; and

4. For costs of suit incurred herein.

**AS TO THE THIRD CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTY:**

1. For compensatory damages in an amount to be proven at trial, believed to be in excess of $17 million, including but not limited to loss of position, salary, benefits, and future earning capacity;

2. For damages for the destruction of Plaintiff's professional reputation;

3. For exemplary and punitive damages against Defendants, and each of them, in an amount sufficient to punish and deter such conduct, pursuant to California Civil Code section

28

COMPLAINT

3294;

4. For prejudgment interest on all sums due at the legal rate pursuant to California Civil Code section 3287; and

5. For costs of suit incurred herein.

**AS TO THE FOURTH CAUSE OF ACTION FOR FRAUD — INTENTIONAL MISREPRESENTATION:**

1. For compensatory damages in an amount to be proven at trial, including but not limited to loss of position, salary, benefits, and future earning capacity in excess of $17 million;

2. For damages for catastrophic and permanent injury to Plaintiff's reputation;

3. For damages for emotional distress, humiliation, and mental anguish;

4. For exemplary and punitive damages against Defendants, and each of them, in an amount sufficient to punish and deter such conduct, pursuant to California Civil Code section 3294;

5. For prejudgment interest on all sums due at the legal rate pursuant to California Civil Code section 3287; and

6. For costs of suit incurred herein.

**AS TO THE FIFTH CAUSE OF ACTION FOR FAILURE TO PAY WAGES UPON TERMINATION (CAL. LABOR CODE §§ 201, 202, 203):**

1. For all unpaid wages and severance benefits, estimated to exceed $1.7 million;

2. For waiting time penalties pursuant to California Labor Code section 203, calculated at Plaintiff's daily rate of pay for a period of thirty (30) days;

3. For all accrued and unpaid vacation and/or Paid Time Off (PTO);

4. For prejudgment interest on all due and unpaid wages at the legal rate pursuant to California Civil Code section 3287 and California Labor Code section 218.6;

5. For reasonable attorneys' fees and costs pursuant to California Labor Code section 218.5; and

6. For costs of suit incurred herein.

**AS TO THE SIXTH CAUSE OF ACTION FOR CONTRACTUAL AND STATUTORY INDEMNITY (CAL. LABOR CODE § 2802):**

1. For reimbursement of all attorneys' fees and costs incurred in defending against

Defendant's investigation prior to Plaintiff's termination, estimated in the hundreds of thousands of dollars;

2. For interest on such amounts at the legal rate from the date of expenditure pursuant to

3. California Civil Code section 3287;

4. For attorneys' fees incurred in enforcing Plaintiff's right to indemnity in this action; and

5. For costs of suit incurred herein.

**AS TO ALL CAUSES OF ACTION:**

1. For such other and further relief as the Court may deem just and proper.

Dated:  December 1, 2025                    **BROWN, NERI, SMITH & KHAN, LLP**

                                                        By:____/s/ Geoffrey A. Neri____
                                                              Geoffrey A. Neri

                                                        Attorneys for Plaintiff
                                                        KEVIN HICKS

COMPLAINT

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a jury for all issues triable by such.

Dated:  December 1, 2025                    **BROWN, NERI, SMITH & KHAN, LLP**

By:     /s/ Geoffrey A. Neri
            Geoffrey A. Neri

Attorneys for Plaintiff
KEVIN HICKS

COMPLAINT

# EXHIBIT "A"



Pebble Beach & Carmel, California
www.stevensonschool.org

July 26, 2014

Mr. Kevin Hicks
11 Interlaken Road
Lakeville, CT. 06039

Dear Kevin:

On behalf of our Stevenson Search Committee, I wanted to let you know what a pleasure it has been for our group to get to know you and Cornelia over the last several days. You are both remarkable individuals and we believe that, as we move into the future, you have the potential to be a most effective and inspirational leader for our School. Accordingly, I am pleased to extend this letter of intent to you that will memorialize our mutual understanding of your role, and our proposal for your first year's compensation and benefits as we begin the process of drafting definitive contract agreements in connection with your being hired as our new Head and President. Please understand that this letter of intent is meant to be a mutually agreeable basis for these further documents, and is not intended to be a binding agreement.

For reference and clarity I have attached the Description of Role that outlines for you our expectations related to the day-to-day responsibilities of the President and Head of School. We envision that you and the School will enter into an employment agreement with a five-year term which will include options for extension as mutually agreed.  The agreement term would begin with your arrival on campus July 1, 2015, for the 2015-16 school year.  The agreement would include the following elements:

1.    **Cash Compensation**.

A.    Salary.  An annual salary of $375,000.

B.    Performance Based Bonus.  In addition to the annual salary, you would be entitled to an annual performance based bonus of up to $25,000. Success in establishing and meeting the annual budget and annual enrollment goals as well as meeting or exceeding annual fundraising goals will be the three objective measures of performance for the purpose of our determining the distribution of this bonus.

2.    **Housing, Transportation and Education Benefits.**

A.    Housing.  You and your family would reside, free of charge, in the Head's House located adjacent to Stevenson School.  We believe that you and your family will enjoy living and entertaining in these generous accommodations during your tenure as President. Our independent consultant places an annual value of $50,000. on this benefit.

B.    Car Allowance.  You would be entitled to a car allowance in an amount of $16,000 to cover your ground transportation needs.

C.    Tuition Remission. You would be entitled to a 100% tuition remission for your daughter at Stevenson during your tenure as President. Tuition at the Kindergarten level is currently $20,500.

3.    **Insurance And Retirement Benefits.**

A.    Health Coverage. You would be entitled to health coverage for you and your family under Stevenson's health insurance benefit bank program. The annual amount of our contribution into your benefit bank account would be approximately $6,700.

B.    Long Term Disability. You would be entitled to long term disability insurance coverage. The annual premium amount covered by the School would be approximately $1500.

D.    403(b) Plan. You would be immediately eligible to participate in Stevenson's 403(b) Plan. The school will contribute approximately 7% of your cash base salary into your plan account or $26,800 based on your first year.

Separate and apart from your role and compensation package, we recognize and value Cornelia's unique experience and talents, and sincerely desire her to have an active role within our School community. As we begin drafting the full set of documents connected with your agreement, it is our intention to collaborate with Cornelia to determine her role at the School. Presently, we envision a senior administrator role that would include leadership in program development, as well as counseling students and mentoring of faculty. Stevenson will offer her a salary and benefits package commensurate with this important position.

In terms of timing, we understand the need for communications to be clear and coordinated with both of our current school communities. If you are agreeable to the basic framework of your proposed compensation and benefits as outlined in this letter, we will move forward in preparing the appropriate documentation, and submitting the definitive contract to the Board of Trustees for their approval. We would anticipate completing this process by responding to your timing needs but by no later than the first week of December of this calendar year.

Once that process is complete, we can then coordinate with each other in making announcements and transition arrangements so that everything is in place for the 2015-16 school year. We hope that you share our enthusiasm at the prospect of you becoming Stevenson's next leader, and further that you are agreeable to the concepts outlined in this letter of intent. If so, please sign this letter on the appropriate signature line, and return it to me. We can then have our counsel prepare the definitive employment agreement and supporting documents, and move forward in what we trust will be a mutually rewarding and beneficial long-term relationship. If you need any clarification of the above, please do not hesitate to contact me.

Thank you Kevin, and welcome home to Stevenson.

_____          _____
Mark Hornberger, Chair Board of Trustees          Kevin Hicks

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("Agreement"), effective July 1, 2015 (the "Effective Date"), is entered into by and between KEVIN HICKS ("Head"), and ROBERT LOUIS STEVENSON SCHOOL, a California Non-Profit Public Benefit Corporation ("Stevenson" or the "School").

In consideration of the mutual agreements hereinafter set forth, Head and the School have agreed and do hereby agree as follows:

1.	EMPLOYMENT AS HEAD OF SCHOOL.  The School hereby agrees to hire and employ Head as Head of School of Stevenson, and Head hereby accepts such employment.  As the Head of School, Head shall perform the duties and responsibilities inherent in and consistent with his position as set forth in the relevant sections of the bylaws of the School as currently in effect, and such other duties and responsibilities as may be lawfully assigned to him from time to time by the Board consistent with the position of Head of School; in particular, the duties set forth in "Definition of Role" prepared by the Board and attached to this agreement as Exhibit A. Such duties shall be carried out in compliance with the School procedures set out in the School Handbook applicable to employees (the "Handbook").  During the Term, Head will have an ex officio position on the Board and each of its committees (other than the Compensation committee). The School recognizes that it is appropriate and beneficial to both Head and the School for Head to engage in certain outside activities, such as serving on boards, participating in professional organizations, consulting, delivering speeches, and writing, provided such activities do not materially interfere with his duties to the School.  Head agrees to keep the Board informed of any material outside obligations for which he will be compensated, and agrees to obtain the Board's prior consent for any such outside activities, which consent shall not unreasonably be withheld.

2.	TERM OF AGREEMENT.

(a)	The "Term" of Head's employment by the School will begin on July 1, 2015 (or such earlier date as contemplated by paragraph (b) below, if applicable) and continue until June 30, 2020, unless earlier terminated in accordance with Section 9 below.  On June 30, 2020, and every two years following that date, the Term of Head's employment shall be automatically extended for an additional 24 months unless either the School or Head provides the other party with 24 months advance written notice of its or his intention not to extend the Term. Assuming neither Head nor the School gives such notice, it is anticipated that the parties would review and discuss the extension of the Term and possible modification of the terms of Head's employment prior to June 30, 2018.

(b)	In the event that Head's employment with the Hotchkiss School is terminated prior to June 30, 2015, his employment with the School shall begin in a transition capacity on the day after his employment is terminated by the Hotchkiss School, with his compensation for such services to be equal to the Base Salary set forth in Section 3(a), payable on a pro-rated basis, less any amounts that he receives as compensation under his agreement with Hotchkiss School.

1428003/2

3.    COMPENSATION.

(a)    Base Salary. During the Term of this Agreement, Head's Base Salary will be at the annual rate of $450,000, less standard deductions and authorized withholdings, payable in accordance with the School's normal payroll procedures. After the first year of the Agreement, Head's Base Salary will be reviewed by the Board and will be increased annually by at least the average percentage increase budgeted for employees of the School as a whole. For the purposes of this Agreement, "Base Salary" shall refer to the compensation set out in this Section 3(a) only.

(b)    Annual Bonus. The Head shall be eligible for an annual incentive bonus of $25,000, based on criteria to be mutually agreed upon by the Board and the Head. Such bonuses will be paid during each July following the end of the school year.

(c)    Section 4958 Compliance. The Board will avail itself of the so-called "rebuttable presumption" of reasonableness under Section 4958 of the Internal Revenue Code (the "Code") and the regulations thereunder with respect to Head's compensation arrangements and any adjustments from time to time.

4.    FRINGE BENEFITS. "Fringe Benefit(s)," for the purposes of this Agreement, shall mean any benefit or payment provided to Head pursuant to this Section 4.

(a)    Qualified Retirement Plan. Subject to all applicable eligibility requirements, Head shall be entitled to participate in the School's Retirement Plan established under Section 403(b) of the Code.

(b)    Section 457(b) Plan. The School shall establish a deferred compensation plan under Section 457(b) of the Code and shall contribute the maximum amount permitted under such section (currently scheduled to be $18,000 for 2015) to the Head's account under such plan in monthly increments of 1/12 of the maximum amount applicable to the calendar year of such contribution. All amounts contributed to the Section 457(b) Plan shall be fully vested at the time of such contribution.

(c)    Health and Welfare Benefits Programs. The School shall afford Head the opportunity to participate in all benefits (including tuition remission) offered to its eligible employees consistent with the terms of such benefit plans, which may be amended or discontinued from time to time in the School's sole discretion. Head and the School shall contribute towards the annual cost of the benefits plan based upon the School's normal contribution schedule for all eligible employees.

(d)    Vacation/Days Off. Head will accrue a total of four (4) weeks of paid vacation time per year. Paid vacation time accrues at a rate of 13.33 hours per month. Accrual begins the first day of employment. The maximum vacation benefits Head may have at any time (i.e., the "cap") shall equal one-and-a-half (1.5) times Head's annual accrual rate. If Head's earned but unused paid vacation time reaches this cap, Head will cease accruing any additional paid vacation time. Once Head uses enough paid vacation time to fall below the maximum cap, Head will once again start earning paid vacation time from that date forward. No additional paid vacation time will be earned during the period in which Head's benefits are at the maximum cap. When Head's employment with School ends, Head's accrued but unused vacation balance

will be paid to Head at his then current rate of pay at the time of separation. Head shall also receive customary School holidays, and shall receive personal days and sick leave, as described in the School's Handbook.

       (e)      <u>Housing</u>. As a condition of employment as Head of School, during the Term, Head will live in a School-owned house (the "Head House"), commensurate with the position of Head of School, designated by the Board as the Head of School's residence. During the Term, the School shall oversee and pay for all maintenance and operating expenses of this residence including, without limitation, grounds keeping, cleaning, general maintenance, and all utilities including electric, gas, water, internet, and cable. The School shall be responsible for any real estate tax liabilities. During the Term, the School shall make and bear the full cost of any improvements and repairs to the residence that Head and the Board agree are reasonably necessary or desirable. If for any reason Head's occupancy in the designated residence is determined to be a taxable benefit under Section 119 of the Code (or such Section is repealed), the School will negotiate with Head in good faith regarding potential modifications of this Agreement in response to such change in circumstances.

       During the term of this Agreement, and subsequent extensions thereof (if any), Head will cause the Head House to be used as the site for cultural, social, development, faculty, student, alumni and/or administrative events for the School. The School will reimburse Head for reasonable entertainment expenses incurred at these events.

       The Head House is provided solely in connection with Head's employment and for the benefit and use of the School. This Agreement does not provide the Head any rights in the Head House. The Head House remains owned by the School, which is liable for all obligations related to the Head House. Head and anyone else living in the Head House shall vacate the premises within 60 days of the termination of Head's employment.

       5.      REIMBURSEMENT OF EXPENSES. The School shall promptly reimburse Head for reasonable business expenses incurred in connection with the conduct of Head's duties as Head of School, including without limitation entertainment and travel expenses, registration and tuition at professional conferences of benefit to the School, subscriptions for professional publications, books and electronic copy for professional development, and dues for professional organizations incurred or paid by Head in connection with, or related to, the performance of Head's duties, responsibilities or services under this agreement. "Reasonable business expenses" shall include business or first class travel for flights if Head determines in good faith that such expense is reasonable in light of the duration of the flight. All requests for reimbursements must be made within ninety (90) days of the incurrence of such expense, and all reimbursements will be made no later than the last day of the calendar year following the year in which such expense was incurred.

       6.      MOVING EXPENSES. School shall reimburse Head, or pay directly the expenses incurred by Head, in moving Head, his family, and all personal property to California, provided, however that, prior to engaging a moving company, Head will obtain at least two competitive bids.

7.      LEGAL FEES.  The School shall reimburse Head or pay directly any legal fees incurred by Head in connection with legal advice or negotiation related to his appointment as Head of School, up to a maximum total cost of $20,000.

8.      POLICIES AND PROCEDURES.  As an employee of the School, Head is expected to abide by and act in accordance with the School's policies, practices and procedures, as may be in effect from time to time. Head further agrees to read, be readily familiar with, and fully comply with the provisions of the School's Handbook as well as any changes, modifications and/or amendments thereto. To this end, Head also agrees that he will execute a written acknowledgment to this effect as may be periodically required by the Board.

9.      TERMINATION OF HEAD'S EMPLOYMENT.  The Term shall terminate upon the occurrence of any of the following:

(a)      Termination by Head.  Head may terminate his employment under this agreement by giving the Board written notice of at least 24 months prior to his intended termination date; provided, however, that he shall not give any such notice prior to June 30, 2017, and no such notice shall be effective earlier than June 30, 2019.  In the event Head elects to terminate his employment pursuant to this provision, Head shall be paid his full Base Salary and Fringe Benefits through his termination date, and shall not be entitled to any other compensation, except for payment of any reimbursable expenses incurred on or before such day, and as may be set forth in the School's various benefit plans and agreements with Head with respect to vesting and rights after termination of employment.

(b)      Termination by the School.  The Board reserves the right to terminate Head's employment under this agreement in accordance with the terms below:

(i)      Termination by the School Without Cause.  The Board may terminate Head's employment "Without Cause" at any time upon written notice to Head; provided, however, that the School agrees to provide Head with 24 months prior written notice of its intent to terminate his employment without cause or to pay Head his full Base Salary and Fringe Benefits during such 24-month period outlined above in lieu of such notice.  If the School opts to pay Head his continued salary and benefits in lieu of such notice, he shall have no duty to seek alternate employment or otherwise mitigate the School's obligation to pay such amounts.  The School shall not give any such notice prior to June 30, 2017, and no such notice shall be effective earlier than June 30, 2019.

(ii)      Termination by the School For Cause.  The Board may terminate Head's employment at any time for "Cause" (as defined below) by vote of a two-thirds majority of the full Board (not including the Head of School) and upon written notice to Head describing in reasonable detail the nature of the Cause and the facts giving rise to it.  In the event Head is terminated for Cause, his employment shall cease immediately, and he shall not be entitled to any further compensation or benefits as Head of School beyond termination, except for payment of Base Salary for periods

- 4 -

ending on or prior to such day, any reimbursable expenses incurred on or before such day, and as may be set forth in the School's various benefit plans and agreements with Head with respect to vesting and rights after termination of employment.

(iii)     Definition of Cause.  For purposes of this Agreement, "Cause" means that the Head has engaged in or committed any of the following: (i) willful misconduct; (ii) gross negligence; (iii) theft, fraud or other illegal conduct; (iv) refusal or unwillingness to perform his material duties; (v) dishonesty in performing his job duties; (vi) material violation of the School's material written policies or rules; (vii) conduct which reflects adversely upon, or making any remarks disparaging of, the School or its Board (provided that this shall not prevent the Head from providing constructive criticism to the Board in any executive session of the Board or other private meeting; (viii) insubordination; (ix) conviction of (or pleading nolo contendere to) a felony or any crime involving an act of dishonesty, moral turpitude, deceit or fraud; (x) any willful act that is likely to and which does in fact have the effect of injuring the reputation, business, or a business relationship of the School; (xi) violation of any fiduciary duty or duty of loyalty to the School; and (xii) material breach of any of the material terms of this Agreement, provided, however, that any violation of clauses (iv), (vi), (xi), or (xii) shall constitute Cause only if the Head has first been provided written notice of the alleged violation and has failed, within 15 days of his receipt of such notice, to cure such violation.

(c)     Termination as a Result of Head's Death.  This Agreement, and Head's employment, will terminate in the event of Head's death.  In the event Head's employment is terminated as a result of Head's death, the School's obligation to pay Head's Base Salary and to pay for any other amounts or Fringe Benefits (payable to Head during his employment hereunder) shall immediately cease as of the date of Head's death. Thereafter, Head's designated beneficiaries or his estate shall be entitled to receive payment of Head's earned, accrued but unpaid Base Salary; Head's remaining salary for the month of his death, if any; and such other Fringe Benefits as may be payable to them in accordance with the School's retirement, insurance and other applicable compensation and health and welfare benefit plans then in effect or by law. Excluding any Fringe Benefit provided for in an applicable plan, any monies due to Head by the School under this Section 9(c) shall be paid within 30 days of Head's death, provided that, if such 30-day period begins in one calendar year and ends in another, Head's beneficiary or estate shall not have the right to specify in which calendar year payment shall be made.

(d)     Termination as a Result of Head's Disability.

(i)     In the event of Head's disability, the School will have the right to terminate Head's employment hereunder, provided that the School must provide at least ninety (90) days' written notice to Head of such termination.  In the event Head's employment is terminated pursuant to this Section 9(d) as a result of Head's Disability, the School's obligation to

- 5 -

pay Head's Base Salary and to pay any other amounts or Fringe Benefits shall immediately cease. Thereafter, Head (and, as applicable, his beneficiaries) shall be entitled to receive Head's earned, accrued but unpaid Base Salary; and such other Fringe Benefits as may be payable to Head in accordance with the School's retirement, insurance and other applicable compensation and health and welfare benefit plans then in effect or by law. Excluding any Fringe Benefit provided for in an applicable plan, any monies due to Head by the School under this Section 9(d) shall be paid within 30 days of Head's termination of employment, provided that, if such 30-day period begins in one calendar year and ends in another, Head shall not have the right to specify in which calendar year payment shall be made.

(ii)    For purposes of this Agreement, "Disability" means an illness, injury, impairment or other incapacitating condition as a result of which Head is unable to perform, with or without reasonable accommodation, the essential functions of his position as Head of School for a period of 90 consecutive or non-consecutive days out of any six (6) consecutive-month period. The determination of Disability under this Agreement shall be based upon information supplied by Head and/or his medical personnel, as well as information from medical personnel (or others) selected by the School or its insurers. Accordingly, upon request of the School, Head agrees to submit to such medical examinations, to be performed by medical personnel to which Head has no reasonable objection, as may be necessary to determine whether a Disability exists.

(e)    For purposes of this Agreement, all references to Head's termination of employment with the School shall mean a "separation from service" as defined in Section 409A of the Code and the Treasury Regulations thereunder.

10.    RELEASE. In order to receive any pay or benefits in lieu of notice as set forth in Section 9(b) hereof, Head must (a) execute a release of all claims Head may have against the School within forty (40) days following Head's termination of employment and (b) not revoke the Release pursuant to any revocation rights afforded by law. If Head complies with the preceding sentence, the School will begin the severance payments to Head on the first payroll date that is fifty (50) days following his termination of employment and will also make a lump sum payment of the amounts of severance that would have been paid to Head prior to such payroll date if the severance payments had started on the first payroll date following Head's termination of employment.

11.    TAXATION OF COMPENSATION AND BENEFITS. The Base Salary and various Fringe Benefits the School provides to Head shall be subject to applicable withholdings and authorized deductions as may be required by law. Head shall be responsible for his share of any federal, state, local or other taxes resulting from any compensation, including Base Salary and various Fringe Benefits, provided to Head by the School.

- 6 -

12.   CONFIDENTIALITY;   SCHOOL   PROPERTY;   NON-SOLICITATION PROVISIONS.

(a)   Head acknowledges that in his employment hereunder he occupies a position of trust and confidence. Head shall not at any time, either during the Term of this Agreement, or at any time thereafter, except as may be required to perform his duties hereunder or as required by applicable law, disclose, furnish or make accessible to others or use, whether directly or indirectly, any Confidential Information regarding The School. "Confidential Information" means (1) all information which is designated by the School or on its behalf as being confidential or private; as well as (2) any and all information that is not generally known to the public that (i) Head learns or obtains in the course of his employment with the School about the School and its current and former students and their relatives, faculty, staff, donors, volunteers, advisors, consultants, officers, directors, and Board of Trustees; or (ii) which, under the circumstances of disclosure, and in the School's best interests, should be treated as confidential. Confidential Information also includes, but is not limited to, information relating to non-public information related to donors and the amount of donations made to the School; non-public information relating to litigation/arbitration related to the School, whether contemplated, pending or concluded; non-public information related to the School's finances, marketing or business plans; and non-public information related to the School's faculty, staff, students and their families.

(b)   Head agrees to deliver or return to the School upon the termination of his employment, or as soon thereafter as possible, or at any other time the School may request in writing (whether during or after Head's employment with the School), all Confidential Information regardless of the form it takes, whether documents (including all copies thereof), electronically stored information (including, but not limited to, email, information stored on any laptop, home computer, handheld personal device or cellular phone, voicemail, text messages, portable storage devices, CDs, DVDs, disks) records, lists, or notes.

(c)   Head agrees that, following the termination of his employment or expiration of this Agreement, he will promptly return all property of the School that is then in or thereafter comes into his possession.

(d)   Head covenants and agrees that during the Term of this Agreement, and for a two year period following the Date of Termination, he shall not, without the prior written approval of the Board, directly or indirectly, whether for his own account or on behalf of any person, firm, corporation, partnership, association, non-profit or other entity or enterprise, solicit, induce, encourage, take away or recruit any of the School's faculty or staff or the School's parents, students, or donors of whom Head has become aware of through his employment with the School. The parties agree that this requirement is necessary to protect the School's trade secrets and to ensure a stable workforce.

(e)   The obligations contained in this Section 12 shall survive the termination or expiration of Head's employment under this Agreement and shall be fully enforceable thereafter.

13.    NOTICES.  All notices and other communications under this Agreement shall be in writing and shall be given by hand-delivery, facsimile ("fax"), or first class mail, certified or registered with return receipt requested. Notice provided by hand-delivery shall be deemed to have been given on the date delivered. Notice provided by fax shall be deemed to have been given 24 hours after transmission of the fax. Notice provided by mail shall be deemed to have been given three days after mailing. Notice should be addressed to the respective persons named below:

        The School:

        Stevenson School
        3152 Forest Lake Road
        Pebble Beach, Cal. 93953
        Attn:  Mark Hornberger

        Head:

        Kevin Hicks

Either party may change such party's address for notices by notice duly given pursuant hereto.

14.    MEDIATION/ARBITRATION.  It is further mutually agreed that should any controversy or dispute between the parties arise in connection with this Agreement or your employment by the School, it shall be resolved by binding arbitration in accordance with the provisions of Title 9 of the California Code of Civil Procedure.  However, before initiating any arbitration proceedings, it is required that an attempt be made to resolve any dispute through non-binding mediation before a neutral mediator.  In the event any such disputes are not resolved by such mediation, the dispute shall then be submitted to binding arbitration, pursuant to, and governed by, the provisions of California Code of Civil Procedure Section 1280, et seq.  The arbitration shall take place in Monterey County, California, at a time and place selected by the arbitrator.

15.    ASSIGNMENT; SUCCESSORS.  This Agreement is personal in nature and neither of the parties hereto shall, without the consent of the other, assign or transfer this Agreement or any rights or obligations hereunder; provided that, in the event of the merger, consolidation, transfer or sale of all or substantially all of the assets of the School with or to any other entity, this Agreement shall, subject to the provisions hereof, be binding upon and inure to the benefit of such successor, and such successor shall discharge and perform all the promises, covenants, duties and obligations of the School hereunder.

16.    GOVERNING LAW.  This Agreement and the legal relations thus created between the parties hereto shall be governed by and construed under and in accordance with the laws of the State of California, without reference to any principles of conflicts of laws.

17.    ENTIRE AGREEMENT; HEADINGS.  This Agreement embodies the entire agreement of the parties respecting the matters within its scope, and may be modified only in writing. Any representation, promises, or agreement not specifically included in this Agreement shall not be binding upon or enforceable against either party.  Section headings in this Agreement are included herein for convenience of reference only, and shall not constitute a part of this Agreement for any other purpose.

18.    WAIVER; MODIFICATION.  Failure to insist upon strict compliance with any of the terms, covenants or conditions hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment of, or failure to insist upon strict compliance with, any right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times. This Agreement shall not be modified in any respect except by a writing executed by each party hereto. In addition, no waiver of any term shall be binding unless in writing and executed by both parties.

19.    SEVERABILITY.  In the event that a court of competent jurisdiction determines that any portion of this Agreement is in violation of any statute or public policy, only the portions of this Agreement that violate such statute or public policy shall be stricken. All portions of this Agreement that do not violate any statute or public policy shall continue in full force and effect. Further, any court order striking any portion of this Agreement shall modify the stricken terms as narrowly as possible to give as much effect as possible to the intentions of the parties under this Agreement.

20.    HEAD REPRESENTATIONS.  Head hereby represents to School that the following statements are true:

(a)    Head has not provided the School with a copy of his contract with Hotchkiss School, nor disclosed the substance of its terms;

(b)    Head has not signed and is not bound by any non-compete or non-solicitation (of pupils or employees, whether current, former, or prospective) agreements with Hotchkiss School;

(c)    Head will not use or divulge any confidential information of Hotchkiss School in the performance of his duties for the School;

(d)    Head's commencement of employment with the School will not be a breach of his employment contract with or legal duties owed to Hotchkiss School, once his employment with Hotchkiss has ended and, provided Head has provided appropriate notice to Hotchkiss School, Head's execution of this Agreement will not be a breach of his employment contract with or legal duties owed to Hotchkiss School; and

(e)    Head will continue to meet his contractual obligations and legal duties owed to Hotchkiss School for the remainder of his employment relationship with it, without regard to any future employment relationship with the School.

21.    REINSTATEMENT OF FORFEITURE.  Promptly following the commencement of the Term, the School shall make a one-time payment to Head in the amount of $30,000, to

- 9 -

offset the deferred compensation Head will forfeit in connection with his departure from the Hotchkiss School.

22.    INDEMNIFICATION.    The School shall indemnify and hold Head harmless against liability incurred in the performance of his duties hereunder consistent with the School's applicable bylaws and insurance policies providing for the indemnification of the School's officers or employees, as they may be amended from time to time in the School's sole discretion (to the extent such bylaws and/or policies are not inconsistent with applicable law).    This obligation shall survive termination of this Agreement.

23.    COUNTERPARTS.    This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

24.    SECTION 409A OF THE CODE.    It is intended that any amounts payable under this Agreement to Head shall either be exempt from Section 409A of the Code or shall comply with Section 409A of the Code (including Treasury regulations and other published guidance related thereto) so as not to subject Head to payment of any additional tax, penalty or interest imposed under Section 409A of the Code. The provisions of this Agreement shall be construed and interpreted to avoid the imputation of any such additional tax, penalty or interest under Section 409A of the Code, provided however that the School does not guarantee the tax treatment of any payment provided for hereunder.

AGREED TO THIS *5th* DAY OF *DEC*, 2014:

ROBERT LOUIS STEVENSON SCHOOL

By: *ITS CHAIRMAN*

HEAD

Kevin Hicks

- 10 -

# EXHIBIT "B"

*DR. KEVIN HICKS INVESTITURE REMARKS*

Since 1952, this is where the future of our world has come to rehearse, using their hearts, minds, and hands: in classrooms and dorm rooms; with peers and mentors; in labs and on stages; on grass and wood; in costumes and jerseys; on beaches and in the mountains; on and in the pool and the Pacific Ocean. To come to Stevenson in any capacity—but especially as a teacher or a student—has always been to challenge others, be challenged by others, and to challenge oneself; to define and pursue excellence free of perfectionism; to dream big and master the art of the possible; to learn how to work well alone and together; to become brave; to become humble; to discover that character and wisdom must finally be realized in decisive and often collaborative action.

This has also always been a school premised on a vision of education as the means by which we discover our world and contribute to its transformation, and an equally keen faith that one's education is best pursued in the company of others, for others' benefit as well as one's own. For more than sixty years, Stevenson has welcomed noble and deserving young people from across the country and around the world and prepared them for honest and honorable lives while training them for the academic and social demands of college study.

Much to its credit, Stevenson has also long been inspired by a most unusual article of faith: namely, that the living of one's life is meant to be a joyous experience. Now, some have claimed to misunderstand our interest in joy, and have dismissed it as a sign of decadence, as a superfluous toy, instead of what it is: a human right, like air, water, food, shelter, liberty, justice, work, and peace. Our vision of a joyful life is quite obviously inseparable from our implicit pledge to do everything within our power to help deliver others—including most definitely those Matthew calls "the least of these"—to their own joy, and to never seek joy at others' expense. To bravely kindle an aspiration for universally joyful living certainly doesn't mean that we are perpetually joyous, or that we expect things always to go our way, or that we meet with joy the well-established anxieties of our age, living as we do on a planet now prone to epochal dysfunction, jagged inequality, and rapidly emerging scarcities.

Quite to the contrary, we know that the truest tests of our character and of our unique fellowship come when we face hard times, just as we know that it is the curriculum of such struggles—up to a point—that are what give this School and our lives beyond it their enduring value. If we meet these tests while taking mindful account of our own human ecology, properly tending our relationships with one another, and moving at a pace and with a purpose that respects the dignity of all souls, it is not unreasonable to believe that we will all be joyous more often than we are not, that we will reap at least as much as we give, and that we will contribute with honor to a world that was here before us, and that we should intend to have be here long after we're gone. This is why our graduates are known far and wide as people who lean forward, reach out, and work tirelessly to make the colleges they attend and the communities that surround them better places.

Now, as when I graduated thirty years ago, Stevenson's students learn how to take risks, and how to honestly assess their results. We learn how to fail, persist, and succeed. We learn that strength, resilience, and authentic, healthy self-esteem come in part through learning how to meet and navigate resistance—to people, to new ideas and ways of seeing, to poems.

We learn that these qualities are developed in relationship to the extraordinary efforts of stellar adults, who give us the gifts of taking us slightly more seriously than we are ready to be taken, of having faith in us before we have faith in ourselves, and of not seeing us always through the lens of our lowest moment. We also discover that those qualities are developed in relationship to remarkable peers who are just as real and as capable of error and forgiveness as we are, and possessed of their own libraries of knowledge, triumph,

and struggle, who come to this School from across the country and around the world to learn and grow with us.

In this light, to the faculty and staff, I will repeat a portion of what I shared when we began the year together in Erdman Chapel: to give any portion of one's life to a school—and to offer daily the colossal, unique energy that Plato has in mind when he describes teaching as "the art of turning the soul"—is both an act of courage and a testament of faith in the power of institutions to do good. Thank you for striving to create an environment for students in which they may discover questions and envision answers that we cannot. You are truly the spine of this place, and it is an honor to serve in your company. Stevenson endures because of your commitment to its cause.